Okay, the next case is number 15, 1876. In Re Noblitt, Mr. Noblitt. May it please the court, my name is Dan Noblitt. I'm here representing myself in my capacity as the inventor for this system. This system is basically a relatively simple thing, and the case at hand is a relatively simple one as well. It's a simple case of this patented trademark office failing to meet its requirements to provide a premium FOSHA case. The technology generally relates to controlling pet access to homes. If you have a pet, you may well know that especially a dog, you have to come home after work, let it out, get up in the morning, let it out. It's a pain. So a lot of people have installed dog doors. A conventional dog door just allows the dog to egress and ingress whenever it feels like it. But that's not necessarily a great solution either. The dog can be out there when the meter reader or somebody else is in the yard. It can cause all kinds of problems. The dog can get out. So how do you handle this? Now, the state-of-the-art system is to use an RFID tag which is attached to the dog's collar. When the dog walks up, it senses it's an authorized raccoons coming into the house and that's basically the state-of-the-art. The problem of course there is, again, that you can't keep the dog from leaving when you don't want it to. There's no way to do so without going home and either locking it or manually unlocking that door. So the technology here is instead a wireless unit that controls the dog door at the dog door. And that can be controlled by a remote computer via a control signal that says, okay, unlock the door so the dog can get out. And then you can relock the door when either the dog is out or once the dog is back in. Everything you just said is disclosed by Cates, right? It is not actually. Cates actually has a completely automated system which is designed for controlling the training of the dog. It sets timers from a remote computer to lock and unlock the pet doors. It can do that and that's the thing. It has basically two aspects to Cates which are different. Cates is a completely automated system so it can only control that dog door with a timer. And actually it's McClintock that handles it with the RFID type pet key. But it controls it strictly through timers or in response to sensors. So if it gets too hot or too cold or whatever the case may be or if there's a dog outside that it doesn't recognize it. But the idea of a remote computer controlling the locking and unlocking of a pet door, that concept was already existing in the art. It's actually not. If you review closely Cates and again this is part of the problem is that the Patent and Trademark Office's case relies on a whole bunch of assertions relating to the ability to already have the capacity to remotely lock and unlock the doors. Okay, so how would you describe what Cates discloses? Cates is a local control and if you look at figure 1 and figure 12 of Cates you'll see that it's strictly local control. You have a monitoring system which is wired to the dog door itself and that's how you manage that dog door. You do so and again it's programmed. It's an automatic thing where you have either the sensors or some sort of timers that do it. There's no selective ability to lock and unlock that door and it's not remote. It is a local system. Now there are a couple of, I'm sorry you were getting ready to say something. Selective? I mean you can program the timer, right, to lock and unlock the door. Sure. So there is some ability to select when the timer... But the claims call for a control signal and a selectively operable lock. I know but you're telling me that it's somehow an inflexible system and I don't think that's a fair way to characterize Cates. I think it is a fair way to characterize Cates. Oh, it will only and always lock and unlock according to a certain time of the day forever? You can't reprogram Cates so that it can change the time that the door will lock and unlock? Sure you can. Well then there is some flexibility. Then you and I agree on that level. There is some flexibility to be certain but can you remotely control that lock to say okay I'm not going to be able to make it home tonight. I'm going to unlock that door. No, there's no indication that you can do that. And again I would also point out that it's not a remote system. What about paragraph, I guess it's 183 of the appendix, says the remote control 112 communicates with the computer system 103 using the RF transceiver 602 to receive status information and to send commands to the system. Then one sentence after that it says, two sentences, the owner can use the remote control 112 to send commands to the system. Yes, that's true. The remote control can send commands to the system but it doesn't say what kind of commands. If you read the greater context of Cates, it's just talking about programming the system. And there are other commands. You can control the video system, the audio system. The Cates system is a large patent disclosure. There's a lot there. They talk about animatronic trainers. They talk about ball throwing systems and automatic feeders. But there's no indication that you can actually control the dog door via that remote control at all. Again, it's also a... What about 178? It says the system 100 can recognize the strange dog or other animals in the area and take appropriate action. Lock the dog door 3. Again, that's an automated system. That's a response to a sensor that has nothing to do with actually remotely controlling that dog door with a selective signal. And again, that part is local. That part is handled by the monitoring system. I think it's 110 or 111. That monitoring system is local. Now the only other thing that the Patent and Trademark Office points out that might be argued as a remote system is the base unit 104 and controller 1203. But is it much of a stretch if to say that the owner can communicate remotely with the system to say that the owner could then control... It'd be an obvious variation to say the owner can control the locking and unlocking of the door. I think it is a stretch in the greater context of the CAITS system. The CAITS system is again dedicated to automatic control. The idea with CAITS is that you can program this thing in a walking way. In CAITS, you can... The owner of the dog can remotely interact with the dog, right? Correct. In what ways does CAITS disclose where the dog owner can remotely interact with the dog? I think the PTO brief actually discusses that to some degree, and I can find the references specifically if you like. But largely it refers to he can look at the dog with the video system, talk to the dog with the speakers, listen to the dog via the microphone using that remote control system. That's really what that remote is all about. It can also activate, I believe, certain things like a ball-throwing system and maybe a couple of other things. But there's no... Again, the idea of CAITS is it's essentially a walk-away. You program this thing to do its thing, and it takes care of you. Well, there's an interactive element, I guess, is what you would have to admit. I don't think we have to, actually. Okay, so being able to interact with the dog, being able to interact with certain toys to activate the dogs, you don't think it's fair to say that CAITS discloses an interactive component? No, I don't think so. And again, the findings of fact aren't supported by that. What CAITS is doing really is just providing you the ability to monitor the dog, kind of check in on its health and status, see where it is. It's not really the remote one. The dog owner is not playing with the dog? Not really. Not talking to the dog, listening to the dog, and activating a toy with the dog? Yeah, I think it can do those things, right. But again, you're not remotely... Again, the invention is not about a way to remotely play with your dog. The invention is a way to control the dog's access to and from the house. And the CAITS system is set up not to do that. The CAITS system is set up to say, I'm going to control this dog, and I don't want to have to mess with it anymore. The idea is that I've got a series of sensors that are going to monitor temperature, humidity, whether there's a problem in the house, whether there's animals outside. I'm just going to walk away from this thing. It's not really designed. In fact, it goes away from providing somebody to go and have control over the various things like the dog door itself. And that is really largely reflected in the way the Patent and Trademark Office comes at this. Instead of relying on actual disclosures and the reference to support their position, instead they sort of wave their hands at these things. They say that CAITS already has the capacity to remotely lock and unlock doors, but when you actually refer to it, look at the reference, it does not actually have that capacity. Their conclusions are drawn from findings of fact that don't actually support those conclusions. The conclusions are that it has the capacity to remotely interact, to remotely lock and unlock these doors, when in fact it does not. Instead, what it does is it automatically does so, and it does so locally. Now, they do make a big point here about, if you'll refer to Figure 1 of CAITS, which is at A50, about how the base unit 104 can... What about McClintock? You haven't mentioned McClintock. I haven't gotten that far, but yeah, okay, let's talk about McClintock. The McClintock system is basically a way for managing a series of doors and access to those... It teaches the concept of remotely locking and unlocking a door, right? Not entirely. What it does describe is a judging person, which is effectively a security guard, looking at a camera... Wait a second, wait a second. What part of what I said is wrong about what McClintock discloses? I said McClintock discloses the idea of remotely locking and unlocking doors. What was wrong about that statement? Two things. One, what it refers to is a judging person locking the door or controlling the door in a security guard type arrangement, and it refers to using a browser. When you say security guard, I look at the drawing, Appendix 39, it shows this lady. Looks like she's going to her house. She's got a big purse and sunglasses on. It doesn't look like she's a security guard. Yeah, and she's not actually the person that the McClintock person... McClintock is referenced as referring to at that point. The lady there is the person trying to gain access. She's the card wheel. I see. There is a point in the McClintock reference where the door administrator, which is different from the judging person, is referred to as 52, which is the browser you'll see at the top of Figure 1 there. But that's kind of an isolated instance. Every other reference to door administrator doesn't have the number 52, and the number 52 typically refers to the browser. Why couldn't... Fair enough, fair enough. But why couldn't a door administrator be a homeowner? Well, I don't know that a door administrator couldn't be a homeowner. I'm not sure I understand. They probably could. The point, though, is in this case, the way it's phrased in the McClintock reference is there's a judging person who may respond to... By and large, the McClintock system is a key-driven system, and it's a way of matching up keys with the various doors. There is a point where they refer to... The person doesn't have their card, so they can contact the judging person, presumably a security guard, say, hey, I forgot my card or what have you. That person, the judging person, can look at the person's image on the video camera and say, okay, come on in and do something through the browser, presumably clicking a button, and that person comes in. Now, that is not really analogous to a pet situation. Pets don't really walk up to the door and buzz and say, hey, let me in. That's not really the context that we're looking for here. We're looking for a situation where the owner is the initiator, trying to lock or unlock the door to let the pet in or out. So it really doesn't apply the same. But that's really as close as we come in McClintock. There is a reference in McClintock to controlling pet doors, but they go away from that scheme. In the McClintock reference, they talk about really only two things, which is setting up times of operation, or again, that RFID pet key. But the office said, ultimately, appreciating that there was no specific disclosure, that the combination of the positions and the description of these two references would have, that it was obvious to combine in the way that you did, and therefore, it was obvious under 103. Where is the error in that? The error is that there is really no motivation at all. That they do provide this motivation. Essentially, they wave their hands at that part, too. They say, it would be obvious because now somebody can control this anywhere anywhere where there's the internet. But really makes no reason why you would combine that aspect of McClintock with CASE. CASE is an automated system, and yes, you can set up the programming potentially from the remote control, but there's no real reason why you would want to control the dog door automatically, the dog door remotely. That's already been set up for automatic control. It automatically opens itself and closes itself according to the various sensors or what have you. There's no reason. Meanwhile, the McClintock system has this specifically to accommodate the security guard situation. McClintock is also a highly automated system, but it uses this security system, the kind of security guard judging person override for that particular instance, which is inapplicable in a dog door scenario. All right. Thank you. We'll hear from the office, and we'll save you a lot of time. Mr. McBride. Good morning, Your Honor. May it please the Court? This case is a very straightforward case of obviousness based on two references, CASE and McClintock. Now, the CASE reference nearly anticipates the claimed invention. It discloses a system that can automatically from a remote base station lock and unlock a dog door that can be located somewhere in the house or at a dog door outside, and it can unlock and lock that door automatically based on conditions that are sensed,  or a stray animal in the yard. The one gap that CASE does not explicitly disclose is remotely controlling the door lock from a remote computer that is actually remote from the system of CASE. Now, CASE does disclose, as you touched on, the ability for a dog owner or a dog trainer to log in to the system via a remote computer, either through some handheld remote control device or through a computer that's connected through the internet with a web browser, and they can both interact with the dog using audio and video capability, and they can train the dog, and they can send commands to the dog verbally, and they can also send commands to the system. Now, CASE doesn't actually go into detail about what specific commands the owner or the trainer can send to the system, but one of those commands, if you're training your dog, one command you could understand would be to unlock the door to let the dog out or to lock the door if you think there's an animal outside that you don't want to come in the house. Now, McClintock fills that narrow gap. The McClintock system discloses a system for controlling access to doors from a remote computer anywhere that a web browser is available, and that's in McClintock figure one. It shows the element 52, which is where the administrator can be located. A judging person can look at someone who doesn't have credentials to unlock the door themselves, communicate with the person with audio and video capability, and make a judgment if they want to let that person come into the door and to unlock and lock the door. McClintock in paragraph 65 also discloses a method in a system for controlling a dog door remotely, and it has a timer system that the owner can actually set the times of operation, so those disclosures in combination with CASE render the claimed invention obvious, and I think there's substantial evidence in the record to support that determination. That prepares or that concludes my prepared statements. If you have any questions, I'll be happy to answer them. Otherwise, I'll take a seat. Thank you. Thank you, Mr. McBride. Mr. Nobler. Let me respond to the points that the Patent and Trademark Office brings up here. In particular, they rely pretty heavily on McClintock, and they make a lot of the same arguments here that the PTO makes that they don't really have any substantiation. They presume that CASE has the ability to remotely control the door, that you can unlock it and lock it remotely as claimed. That's not supported by the reference. I ask you to, upon review of this case, skeptically review the references themselves in view of what they are purported to support. The conclusions that they draw, that CASE provides the remote locking and unlocking, that's simply not true. It's automated locking. It's also not remote. It's handled by a local system. The monitoring system is local. It is not remote and wireless. The wireless systems in CASE are not dedicated to controlling that door. When it comes to McClintock, McClintock itself, as the PTO just pointed out, does refer to controlling dog doors, but refers to controlling dog doors in a conventional way. It talks about doing it with a timer and doing so with an RFID PET key. That's not what's claimed. It really has nothing to do with the CASE here. It's just a disclosure of the prior art. The only other thing that McClintock refers to is some sort of ability to remotely control a door, but again, that is solely in conjunction with that security guard scenario, which is inapplicable when we're talking about pets. So what we're met with at the end of the day is just pretty much a classic case of hindsight, where yes, looking at the claims, you can go back and you could potentially reconstruct an obviousness argument that the claimed invention is somehow disclosed if you squint at it just right, but that's really not appropriate here. This is a classic case of hindsight. There's nothing in the references that actually support the legal conclusions drawn by the Patent and Trademark Office, which right there eliminates the prima facie case. If you add on top of that the fact that there's no real motivation that's drawn from the references or that's provided by the Patent and Trademark Office that would have caused you to change a fully automated CASE system to something that's selectively controllable by a remote computer, there's definitely no case there at all. On account of it, I would submit that the PTAB's rejection should be reversed. All right. Thank you. Thank you, Mr. Narver. Thank you, Mr. Narver. Any other cases taken under submission?